## A. B. DICK CO. v. SIMPLICATOR CORPORATION et al.

Circuit Court of Appeals, Second Circuit. July 8, 1929.

On Motions for Reargument October 7, 1929.

No. 362.

Carmody & McLaughlin, of New York City (Thomas Ewing, of New York City,

936

A. Arnold Brand, of Chicago, Ill., and N. S. Amstutz, of Valparaiso, Ind., of counsel), for appellant Simplicator Corporation.

Archibald Cox, of New York City, for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. This is the ordinary patent infringement suit. The patent is for an improvement in stencil sheets for reduplication of typewritten matter. A stencil sheet is a sheet adapted to be converted into a stencil for multiplying copies with less equipment than by printing, particularly in machines which position the paper and stencil and apply ink, so that it passes through the apertures in the stencil and reaches the paper.

In the beginning sheets impervious to ink were used to form stencils, and these sheets were cut or perforated, so as to let the ink through the apertures to the paper on which the duplication was to be made. The full face of the type could not be cut through these sheets, but only the outline of the letters because, if continuous cuts were made, the centers of loop letters such as "o," "a," "b," and "d" were likely to drop out. Consequently a so-called "pin point" typewriter was used, which simply traced the outline of the letters.

The first important step in making the modern stencil was taken by Broderick, who invented a stencil sheet for which he obtained United States patent No. 377,706, in 1888. He discarded the idea of an impervious sheet, and adopted a thin porous sheet of Japanese paper, called "Yoshino," as the basis for his stencil. This was a lacelike paper having a long fiber and open in texture. He coated it with paraffin wax, which filled all the little pores, so that when the stroke of the typewriter key came down it forced out backward the paraffin, and left the holes in the open lacelike sheet, clear over the full-faced reproduction of the type. Across these openings extended the fibers, substantially uncut, so that there was a multitude of little ties holding the centers of the loop letters in place, and yet throughout the entire portion of the stencil which had been pressed upon by the type the wax was extruded, forced backward, into another sheet, or extractor, which was generally set behind to take up the wax. The removal of the wax in that way was called "extraction." The stencil thus made reproduced for the first time the full-faced outline of the type.

In the old system the cuts were made through the base chosen for the stencil sheet. In this system of Broderick the coating alone was removed, and as far as possible the foundation was left undisturbed. But the Broderick sheets were fragile and easily injured, because of the brittleness of the wax. A little crinkle in the sheet tended to break the brittle wax and to disintegrate the texture of the coating, and when the ink was applied the crinkled lines would be more or less reproduced by seepage through the minute cracks. Changes in temperature also affected the sheets. Hot weather made the wax soft and sticky, so that it was apt to clog the type if a covering sheet was not attached to the stencil. The production of copies from these stencils was limited and that of one thousand copies was ordinarily regarded as extremely good work.

These Broderick sheets were largely superseded by so-called indestructible stencils, made under the United States patents No. 1,101,268 and No. 1,101,269 to Fuller, granted June 23, 1914.

In the process patent, No. 1,101,269, Fuller called attention to the fact that it had been the former custom to make stencil sheets by coating them with wax, and to form the necessary characters on the sheets by striking the wax with a typewriter, in order to express it from the sheet wherever it was struck. He said that this method had proved unsatisfactory, because it was necessary to remove the wax in order to secure clear copies, and because it was not possible to do this with an ordinary typewriter. He added that the wax on the stencils deteriorated under changes of temperature, and that they had a comparatively short life. To obviate these difficulties Fuller made a coating for Yoshino paper of gelatin and glycerin to keep the sheet soft and extended, and of bichromate or formaldehyde to harden or tan it. His stencil was tougher, stronger, more durable, and would run off many more copies than the wax stencil of Broderick, and, to a great extent, displaced the latter on the market. But it was necessary to moisten the Fuller stencil before using it. The material for the coating was broadly described as coagulated protein. Protein is a class of chemical substance containing nitrogen, and includes gelatin.

Stencils must, of course, be stored pending distribution to the public, and will often remain for a considerable time in the hands of the consumer before use. It is desirable that they be at all times available without any special treatment. The necessity of moistening was a distinct obstacle, involving annoyance and waste of time. Moreover, the

moistening which was necessary before use resulted in rusting and gumming the keys, and, after the moisture dried out, the sheets were likely to shrink and warp,. so as to make an imperfect reproduction.

It was to obviate the defects of the Broderick and Fuller stencils, which had represented the best known advances in the art, that Hill, an employee of A. B. Dick Company, made the invention embodied in the patent in suit. In the specification he refers to wax stencil sheets, comments on their disadvantages, and says that they have been to a great extent superseded by stencil sheets in which a base of open texture porous material is coated with coagulated protein, such as gelatin combined with glycerin and treated with a suitable coagulent. He adds that, if stencil sheets of the last kind have been stencilized for a substantial period of time after the coating has been applied, they will be too brittle, and it will be necessary to soften the coating material by the application of moisture. He says that his object is to produce a stencil sheet that will improve upon the existing art, "in dispensing with the necessity of temporary moistening of the stencil sheet during the stencilizing operation," and that to attain this end he has devised "a coating or impregnating material characteristically different from anything ⁑ ⁑ ⁑ heretofore ⁑ ⁑ ⁑ developed, and which, when applied to the foundation sheet, results in a stencil sheet which is at all times ready for use by inserting the same in a writing machine and typing thereon."

The inventor goes on to say that in carrying out his invention he employs a base of open texture, such as Yoshino, and coats or impregnates it with a cellulose ester, such as cellulose nitrate or cellulose acetate, by treating the paper with a solution of such cellulose ester in a suitable solvent; that the material he prefers to employ and with which excellent results may be obtained is known as "pyroxylin enamel," a solution of nitrated cellulose in a suitable solvent. He further says that this enamel, as at the time commercially available, has the consistency of ordinary molasses; to a given quantity of the pyroxylin there should be added a suitable proportion (50 per centum will give good results) of a tempering agent, such as castor oil, to prevent the pyroxylin from drying too hard and making the coating undesirably brittle; and that finally it is advantageous to add to the mixture 5 to 10 per cent. of some fatty or tallow-like ingredient to serve as a setting agent, and to act as a preservative of the proper consistency of the finished article,

and to keep the composition in a proper state of softness, fluency, and displaceability.

He states that "it has been found that in stencil sheets made as above described the coating remains throughout an extended period of time practically unchanging and without preliminary moistening, capable of being removed or displaced, as by the blow of the type of a writing machine or by the pressure of a hand stylus, from or on the underlying foundation sheet of Yoshino, leaving the open-texture fibers of the latter practically intact for the support of the centers of loop letters. ⁑ ⁑ ⁑ ⁑ "

Cellulose is the chief material composing the walls of plant cells, and is perhaps best exemplified by cotton fiber. Cellulose esters are compounds of cellulose produced by the interaction of an acid with the cellulose; nitrocellulose is a compound of cellulose produced by the action of nitric acid, and acetyl cellulose by acetic acid. Cellulose compounds in general possess a considerable degree of hardness and toughness, and, unlike gelatin, a resistance to water.

Pyroxylin is the name for part of the general class of cellulose nitrates that applies to the lower nitrates, that are apt to be more soluble and more plastic, and less explosive and less dangerous, than the higher nitrates. When pyroxylin alone dries out of solution, it is hard and horny. We see it after it has dried out in such things as bathroom fixtures and enameled bedsteads. Such enamel is brittle, and frequently chips when it gets old. When castor oil is added to the pyroxylin in sufficient quantities, the substance passes from a horny to a pliable condition and will not dry up. But a large percentage of the castor oil tends to make the coating sticky. To avoid this result, and to preserve the proper consistency of the finished coating, the fatty material is added as a setting agent.

The new stencil sheets were put out under the name of "mimeotype," and have largely driven the old wax-coated sheets and the modified gelatin-coated sheets from the field, even though "mimeotype" was sold at higher prices than the others. The defendant company, two years after the application for the patent was filed, wrote a letter to A. B. Dick Company referring to defendant's stencil sheet, which is substantially the same article as the Dick stencil, in which it was said that the necessity of moistening stencils was a most objectionable handicap to the sale of stencils on a large scale; that its new stencil "wants no moistening," implies a "vast improvement," and involves "immense possibilities of business."

There can be no doubt that the new form of stencil described in the patent was a decided advance over the prior art which we have described. But it is said that the Hill stencil showed no advance over the Belgian patents to Campion. The first of these patents, No. 292,613, antedated Hill. The specification of patent No. 292,613 referred to the fact that paraffined stencils allow the ink to pass through the cracks which are accidentally formed, either in the handling itself or by being pulled along in the machine when the text to be printed is impressed, and thus give rise to ink stains in the copies. It is said that other sheets have to be moistened before use, with the disadvantage of rusting the typewriter. Campion, in order to obviate these difficulties, impregnated his sheet of Yoshino with collodion and covered one side of it with a layer of paraffin. The latter was said to have the effect of keeping the collodion supple and of serving at the same time as a pad to the blow, allowing the easy perforation of the collodion film by the character of the typewriter. The specification stated that such a sheet did not have to be moistened. It added that the same advantages could be obtained in a lesser degree by using two superimposed sheets, the first collodionized and the second paraffined, or by using a single sheet collodionized, the supporting foundation being covered with a film of paraffin.

It is evident that this stencil of Campion involved a wax coating on one side of the sheet, or a separate waxed sheet, or a film of wax varnished with collodion, and did not, like Hill's invention, contemplate the use of only a single sheet of Japanese paper impregnated with a cellulose compound. Much less did it suggest any formula for the coating. It is true that the first claim of this Campion patent set forth a sheet impregnated with pharmaceutical or industrial collodion and nothing more; but not only does the specification prescribe the use of paraffin either on the stencil sheet or on a separate sheet, but collodion, though a cellulose compound, admittedly will not make a practical stencil without softening (folio 1094), and it contains only about 6 per cent. of castor oil, and not the large proportion recommended in the Hill patent. Campion gives us no suggestion that a cellulose compound may be so modified as to make a type-impressible coating. He merely says that a wax stencil sheet may be supplemented by a skin of collodion, so that the ink will not seep through the cracks in the wax.

The second Belgian patent to Campion No. 234,067, has for its object an improvement on the first patent by the "replacement of pharmaceutical or industrial collodion with which the sheet of Japanese paper is impregnated, by a solution of celluloid to which castor oil is added." Celluloid is a cellulose compound. In this second Campion patent the first claim is for "a process of manufacture of type sheets for duplicators according to the principal patent above mentioned comprising a sheet of Japanese paper impregnated uniformly with a solution of celluloid in its solvents, to which solution is added castor oil or a similar suitable oil."

The words "according to the principal patent above mentioned" indicate that the second patent, like the first, presupposes two films. The specification requires no large proportion of castor oil as a necessary softening agent, and suggests no proportion for the ingredients of the compound. It is at best altogether too vague to serve as an anticipation of the patent in suit. The Campion patents were only a modification of the wax-coating stencil sheet of Broderick, in which Campion attempted to get away from the difficulties of both Broderick and Fuller.

The contention that United States patent No. 562,590 to Dick defeats the patent in suit is still more illusory. It almost goes without saying that a new stencil sheet like Hill's, which has been put upon the market by A. B. Dick, and has met with such great success, did not find its origin in such an old device of Dick himself as is shown in the patent of 1896. Indeed, we held the first three claims of that very patent to have been anticipated by Broderick. A. B. Dick Co. v. Wichelman (C. C. A.) 108 F. 961. This old Dick patent is supposed to be relevant, because the specification suggests the protection of the coating of paraffin mixed with lard oil by a thin elastic varnish of nitro cellulose. The claims 4, 5, and 6 call for such a protective varnish. But the patent nowhere describes a stencil sheet with a single coating of cellulose compound, and the stencil sheet contemplated is the old wax-coated sheet of Broderick somewhat softened by lard or lard oil and varnished with a thin film of nitrocellulose. Stencil sheets were made for years without overcoming the objections to a paraffin-coated sheet, and not until a coating of paraffin was abandoned did the difficulties disappear.

The Gestetner United States patent No. 1,371,157 has also been cited as affecting the Hill invention. That patent suggested the use of a pyroxylin or celluloid solution to size the base of a stencil sheet in order to toughen the Yoshino fibers. The outer coating of the sheet however was to be of gelatin. Gestet-

ner's patent had but the most remote relation to the Hill invention, and involved a chemical treatment for the base of gelatin-coated stencils, and apparently nothing more.

But the prior art which has perhaps been most urgently pressed is the so-called Calhoun use. Father Calhoun was a priest of the Jesuit order, who for many years experimented in developing practical stencil sheets. He started out with a paraffin-coated process, later worked on a nitrocellulose process, and says that he experimented with the same ingredients which are recommended in the Hill patent. He certainly kept his process secret and intended to do so, but such stencil sheets as he made were used for examination papers for his students, and were at one period also sold by his brother Paul, who conducted a business on his own account, about the year 1917. That Father Calhoun was a teacher of chemistry and a practical scientist, who showed great zeal in developing stencil sheets, there can be no doubt. But he was unable to present any formula which he had employed in making stencil sheets coated with nitrocellulose and softened with fats and oils. He likewise failed to produce any stencil sheets of the period about which he testified. His corroborating witnesses, moreover, had no clear understanding of the processes which he was following.

We cannot regard such memory testimony as sufficient to overthrow a patent, not because we doubt the good faith of Father Calhoun, but because the proof amounts to no more than his statement that he used the same or similar ingredients in his process that Hill used, and that he made a successful stencil. There is nothing to show the relative proportions of his various ingredients, or the length of time that his stencil sheets would remain soft and practically usable. Orr, the secretary of the A. B. Dick Company, on the other hand, testified that the "mimeograph" stencil sheets would frequently not be stencilized for a year after they were made, and said: "We would not put a stencil on the market unless we felt sure it would remain in good stencilizable condition for at least a year and a half."

There is nothing to show that Father Calhoun did not simply make stencil sheets, coated with nitrocellulose and softened with castor oil or palm oil, which had but a short-lived use. They still might have answered a temporary purpose. Campion employed a solution of collodion with castor oil added as a softener to impregnate the Yoshino sheets, but neither in the Campion process, nor in the experiments of Father Calhoun, is a large percentage of castor oil shown to have been used. Nor is there proof that either process would develop a stencil sheet that would not require additional moistening after a substantial time had elapsed, as is the case with the Hill invention. Even the wax sheets of Broderick, if so freshly made that the coating had not begun to harden and crack, might have answered the purpose as well. There is no satisfactory proof that Father Calhoun's stencil sheets remained usable for extended periods of time and were free from the difficulties which had long beset the art.

Moreover, though Father Calhoun said that in the year 1913 he had made a stencil of cellulose material that would receive a clear impression in the typewriter and transmit a good clear copy on the mimeograph without previously moistening (folio 626), he admitted that he was still attempting to deal with the cutting out of letters a number of years later. But the fact that he has shown no development of a stencil sheet that corresponded with the Hill invention, and merely went on experimenting, is evident from the general vague terms of his testimony. For example, he said:

"* * * Up to and including the patent date * * * I continued to try methods and devices for variety of oils, fats, solvents, resins, esters, aldehyds, alcohols, and some acids, trying to reach as near as I could with my work a professor's ambition to know as fully as possible his question of research." Page 212.

"* * * I immersed my ether, alcohol, collodion cotton, to which a suitable amount of softening materials had been added. * * *" Page 215.

"* * * I introduced, because looking for special effects on films, every variety of hard-to-evaporate solvent that I could pick up, such as acetic acid, nitrobenzine, furol, and a number of others. Thus I continued up to the date mentioned in the patent to make use of these materials in these ever-changing methods to get better results and new results until the present time, even now." Page 217.

"I have spoken of the solution of gun cotton in alcohol and ether or banana oil, or amylacetate as part of the 'stencil dope.' * * * So I began first to employ castor oil, and glycerin, and lard; and this idea of lard would naturally lead me to the kitchen, to which I had full access, and so tallow and goose grease. And as my teaching or organic chemistry affords me to keep on hand all kinds of fats, and as I know each fat has its own peculiar properties, one dissolving or

emulsifying well with one solvent, and another being no good, or inferior, for that solvent, I went through the ordinary list of oils and fats, such as tallow, corn oil, peanut oil, sulphenated oil, wool fat; and unless you think it necessary I will stop the list there, but if you desire I will continue—thus finding out the definite results of substances that would give you a great modification of flexibility and softness of film from the old collodion bath now obedient to science." Page 218.

"* * * So that I could say then that my cellulose stencils comprised these types of ingredients; cellulose nitrate, with suitable high-boiling and low-boiling solvents, to which were added oils or fats, or alcohols, or esters that possessed the property not merely of emulsifying themselves with this solution, but acting as a partial solvent, and, consequently, never sweating out, and therefore get away from the necessity of a mere setting agent like talcum, or barium sulphate, and the like. This softening agent, then, of oils and esters, to which the semisolid fats were added in a quantity depending upon the amount of pyroxylin present, with the coloring matter added for the sake of looks and a nice stencil, involves the work that I did; pyroxylin, proper suitable solvents, softening agents of the nature that I have stated, setting agents if necessary—avoided if possible—the proper toning, and coloring it, to produce results. * * *" Page 220.

It is impossible to regard such an account of Father Calhoun's experiments, continuing, as the witness said, even down to the time of his testimony, as meeting the severe test required to establish a prior use. As we said in a recent case, when discussing the degree of proof necessary to sustain a prior use, "the rule comes nearly to this, that one must have contemporaneous records, verbal or structural." Block v. Nathan Anklet Support Co., Inc., 9 F.(2d) at page 313.

Father Calhoun's description of his process gives insufficient information to enable one to make a stencil sheet like the one set forth in the Hill patent, and yet it is relied upon to anticipate that invention. In spite of all Father Calhoun's experience with stencil sheets, he never seems to have produced in court any stencil or stencil sheet made in accordance with the teaching of the patent. Those that he made five or six months before his deposition was taken in this suit may, as he said, have been only illustrative, but their inadequacy casts doubt on what he was ever able to accomplish in making such stencil sheets as the patent describes.

■ It is true that an anticipation may be good, though it does not work as well as a patent; but there must be proof that it was for an operable structure and that it attained the same general result. It has not been shown that Father Calhoun made stencil sheets that would remain usable during an extended period of time without moistening. The trial judge, in commenting on the Calhoun use, said: "While the integrity of purpose of the witness may not be questioned, the court cannot conclude that such devices have been proven satisfactorily and beyond a reasonable doubt to be anticipatory of plaintiff's invention." We see no reason to doubt the correctness of this finding.

■ It has been earnestly argued on behalf of A. B. Dick Company that the Calhoun use can in no event serve as an anticipation of the patent, because Father Calhoun had preserved his mode of composition as a personal secret. The patent in suit was not for a process, and we recently said in Grasselli Chemical Co. v. National Aniline & Chemical Co., 26 F.(2d) at page 309, that such "a use is public, though the invention cannot be learned, unless the embodiment of it is destroyed." But we do not have to consider the effect of secrecy here, because we hold that the memory testimony of such a delicate matter as the manufacture of a satisfactory chemical compound for a stencil sheet is insufficient to sustain the burden which has been imposed in the case of the defense of a prior use. The Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; Electrical Engineers' Equipment Co. v. Champion Switch Co. (C. C. A.) 23 F.(2d) 600; Winget Kickernick Co. v. Kenilworth Mfg. Co. (C. C. A.) 11 F.(2d) 1.

■ The court below sustained all the claims of the patent, but we regard claims 1, 5, 10, 15, 17, 19, and 20 as not supported by the specification. Claim 1 is typical of these broad claims and reads as follows:

"1. A stencil sheet adapted for conversion into a stencil by the impact of the type and the like thereon, the same comprising a base having a type-impressible coating including a cellulose compound."

If this claim were to be held valid, it would have to be limited to the compound described in the specification. The Campion second Belgian patent shows a base having a "coating including a cellulose compound." It does not anticipate, because there is no showing, as in the Hill specification, of a single film of a cellulose compound, or of a tempering agent, such as Hill uses.

There can be no justification in sustaining

such a broad claim as No. 1, when it would have to be limited by the disclosure of the specification to the elements set forth in the narrower claims, which we sustain. These sustained claims seem amply to cover everything in Hill's meritorious invention. Claims 5, 10, 15, 17, 19, and 20, like claim 1, are invalid, because they call for no tempering agent, and are therefore not supported by the specification.

Last of all it is said that the defendant does not infringe the claims. This, in any event, is only possible as to the claims calling for a "fatty substance" or a "setting agent." To substantiate this contention the defendant introduced evidence that the fatty substance admittedly found in its stencil sheets might have arisen from rancidity of the castor oil. This is at best a remote likelihood, without proof of rancidity. Defendant's answer to the interrogatories shows that a free fatty acid is present in defendant's compound to the amount of 3 per cent. As the patent is not for a process, the compound sold meets the claims of the Hill patent, which is for a completed article. But, irrespective of all this, the claims for a stencil sheet comprising a base having a type-impressible cellulose coating with a tempering agent have, in any event, been infringed. These are the claims for the main invention, and the element of a fatty substance serving as a setting agent is merely a preferred addition.

The decree is modified, so as to dismiss the bill as to claims 1, 5, 10, 15, 17, 19, and 20, and is otherwise affirmed, with costs to the appellee.

## On Motions for Reargument and Amendment of Opinion.

There may be doubt about the statement in the opinion that claims 1, 5, 10, 15, 17, 19 and 20 are not supported by the specification; but in any event there is no necessity at the present time for deciding as to the limits of the patent, or for going farther than to say that the claims, other than 1, 5, 10, 15, 17, 19 and 20, are valid and infringed. Likewise the plaintiff should not be required to file a disclaimer of claims 1, 5, 10, 15, 17, 19 and 20, seeing that a decision in respect to them upon the present record would be moot.

The motion of the appellants for a reargument is denied, and the motion of the appellee for a modification of the opinion as to the disposition of claims 1, 5, 10, 15, 17, 19 and 20 is granted, to the extent of dismissing the bill as to these claims, not on the merits, but only on the ground that a decree as to them would be moot. The decree, as thus modified, is affirmed, with costs.