## E. I. DU PONT DE NEMOURS & CO. v. GLIDDEN CO.

### No. 449.

Circuit Court of Appeals, Second Circuit.
July 10, 1933.

On Rehearing Nov. 13, 1933.

Charles Neave, Maxwell Barus, Paul R. Ames, and J. B. Cuningham, all of New York City, for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis, Daniel V. Mahoney, George E. Faithfull, and Charles W. Riley, all of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is the usual equity suit for the infringement of a patent for a product; that is, for a lacquer made of nitro-cellulose with oils and resins, and for articles coated with it. Infringement is conceded, but the judge declared all the claims invalid. To an understanding of the case a brief statement is necessary, which may be supplemented by resort to the opinion below. De Nemours & Co. v. Glidden Co. (D. C.) 1 F. Supp. 1007. The base of the lacquer in question is nitrocellulose, a derivative of cotton, which when dissolved in proper diluents may be sprayed or brushed upon the object to be varnished, or made to adhere to its surface by dipping. As the solvents are evaporable, they disappear with exposure, leaving a coating upon the object which is hard, tough and adhesive, with a smooth glossy finish. The thickness of the coat obviously depends upon the solids left after the solvents have evaporated, principally the nitro-cellulose. The greater the proportion of this to the solvents, the thicker the coat, and an initially thick coat is what is desired, else the operation must be more often repeated. On the other hand, the greater the proportion of nitro-cellulose in the solution, the more viscous it is, and the harder to spray or brush. The optimum is therefore that solution which will contain most nitro-cellulose and remain most fluid. There would have been no problem, if nitrocellulose were all of one quality, in respect of thickening the solution into which it is put. It is not. In some conditions of the substance a given proportion in a solution will thicken it beyond practicable limits; in others, the same proportion will leave it fluid enough for use. This quality is known as its "viscosity characteristic." To achieve a thick coating and keep the solution fluid enough for use, it was essential to produce a nitro-cellulose of low "viscosity character-

istic," and undoubtedly the art would have welcomed such a lacquer before Flaherty's time; indeed, it had tried to find one. It would thicken each covering and avoid several additional coats.

Various processes were known long before the invention by which viscosity of nitro-cellulose could be reduced; the patent especially mentioned one of these of recent origin, Pitman. However, as the viscosity is reduced, though the lacquered object will be covered more thickly, the coating becomes brittle and will crack or chip. Oils and other softeners prevent this by making it tough; resins make it stick, though they counteract the action of the softeners, and even with softeners the viscosity must not be too far reduced. The art entirely understood the action of these components and had used them for long. The patent did not pretend to rely upon any of these discoveries, and could not. It gave a recipe for reducing viscosity, and for oils or resins, but laid no claim to it or any part of it. It claimed no more than that to produce an effective lacquer of thick coating quality, the viscosity characteristic of the nitro-cellulose must be below a critical limit fixed in the claims. It left the art to its own devices as to how to reduce the nitro-cellulose to the required viscosity, and how by the addition of oils and resins to make the coat tough and adhesive. The examples or recipes were merely illustrations of how the product could be made; they were not part of the invention and the defendant has not followed them; nor indeed does the plaintiff at the present time. They are present merely to conform to the statute.

There are various ways of reckoning viscosity; for convenience we shall adopt the simplest, which is a scale in seconds. The specifications declare that, by following the examples given, "a 25 to 40%" nitro-cellulose "solution may be obtained having a viscosity below" a stated limit, "being practically the upper limit for any commercial solution which is to be used for coating without thinning" (page 2, lines 25–31). This upper limit, by the scale used in the disclosure, involved in fact nitro-cellulose of different characteristics at the two extremes. The characteristic of the nitro-cellulose of a 25% solution measured by that standard is 4.6 seconds; that of a 40% solution is much lower, between .2 and .5 seconds, according to the amount of sodium acetate used to reduce it. Perhaps Flaherty intended by these words to fix a lower limit of viscosity, but the language is obscure, and his claims suggest nothing of the sort. Yet it is a natural way to read the language to suppose that the 40% solution was indeed a lower limit, in spite of the verbal inappositeness of the phrase. However that may be, he did indicate very clearly in his specifications that the viscosity should not be too low. Thus his first example was of lowering it so far as to be too low "even for most purposes," and of building it back by the addition of higher viscosity nitro-cellulose, "to a suitable working point." Clearly he presupposed that the art would understand what that point was, and that it should not make a lacquer too brittle to be corrected by softeners. The art certainly responded, for it had that knowledge and followed him without difficulty. In these circumstances it appears to us irrelevant that the claims contained no lower limit, as indeed they did not. So construed, is the patent valid?

Upon the appearance of the patented lacquer, under its trade-name, Viscolac, the art very generally followed suit, coming to rest for the most part with "half second" nitro-cellulose. Flaherty's work was done in 1920, shortly after the close of the Great War, and at a time when vast stocks of nitro-cellulose were on hand, and when the pressure for its disposal had increased, as well as for some use for the existing plants. This may account for the stimulus to get an effective lacquer of thick coverage, but it does not explain all the facts. The uses of such a lacquer had existed long before, and when it appeared, it largely invaded the field of varnish and in many fields supplanted its use; there is no reason to suppose that if it had been available earlier, it would not have done the same. Furthermore, the art had unquestionably been experimenting with low viscosity nitro-cellulose for a number of years before Flaherty began. In 1913, and thus before the war, Doerflinger, a competent chemist, who later went to the Perry Austen Company, began to work upon low viscosity lacquers. His nearest approach to anything within Flaherty's limits was his formula 415. The technical evidence as to its viscosity, is obscure and baffling. Doerflinger's tests at the time were made by pipettes, and then in only two very thin solutions. The extent to which he reduced viscosity depends upon his testimony; at least there is a dispute as to whether the basis of the experts' experiments, i. e., the defendant's bill of particulars, was the same as that testimony. Doerflinger during reduction neutralized the agent, ammonia, by which he reduced viscos-

ity. There is a dispute as to how far in the duplication of his experiments his moment of neutralization was observed. Upon it the viscosity depended. The evidence being in so much dispute, the severe standard of proof for anticipation was scarcely met in our judgment; but, quite aside from that, we think that the testimony of the art is enough to forbid the conclusion that, whatever viscosity Doerflinger got, he had produced a lacquer such as Viscolac. The Perry-Austen Company was a substantial producer; its wares were sold in quantity. The new lacquer appeared and passed to its customers without comment from them, or any notice of difference between it and the lacquers already on the market; manufacture was discontinued in 1919. When in 1921 Viscolac appeared, it at once commanded the attention of the whole art as something radically new and desirable. Its equal had not yet been available and all recognized that it must be matched. This seems to us at least to throw enough doubt upon Doerflinger's work to put it out as an anticipation. It is explicable of course on the theory that the secret of the success lay in something other than low viscosity. Possibly it did, but the explanation is not forthcoming. It could not have been Hitt's patent for a softener, for Viscolac made its appearance some months before that was used. So far as we can judge, the art had meanwhile received no information for the betterment of lacquer, except the control of viscosity. Why this should not have been earlier taken as critical, especially as the relation between viscosity and coverage was well known, we cannot say; but, so far as we can see, nothing except the knowledge that viscosity must be kept below Flaherty's limit determined the success of the new product. The art apparently had no difficulty in avoiding such reduction as could not be corrected by oils or other softeners.

Our conclusion is borne out by the other evidence. One, Bacon, was a chemist in the employ of the Atlas Company, a large and powerful producer of lacquers. In 1919 this company wished to secure a lacquer of low viscosity and charged Bacon to develop it. An early report, that of July 30, 1919, indicated that he had succeeded; if it stood alone, it might be hard to deny that it was an anticipation of Flaherty, who had not yet begun. But Bacon had been premature in his conclusions. He was diverted to trying out resins and gums, and by August of 1920, by his own admission, had not yet succeeded in making a suitable wood lacquer. It is not necessary to follow his work in detail, for concededly his results in the later part of 1920, and the early part of 1921, are the most important. In December, 1920, he had developed a lacquer of very low viscosity which he used as a resin; it was very sticky and he did not mean to use it alone. To this he added a softener to increase its toughness, but still found that it was too thin. Finally he produced his Adamantine X, in which he did not reduce the viscosity so far as in the resinoid predecessor. Probably, though not certainly, the resulting viscosity was within Flaherty's limit. However, it was probably not satisfactory; there is testimony that it checked and cracked. In any event it appeared in January, 1921, and after Flaherty had developed his own lacquer. Indeed, Flaherty's first sale was in January, 1921, following some trial deliveries in December.

But again it seems to us that we need not depend upon the technical evidence, which, as is so common in chemical cases, is confused and uncertain. As in the case of Doerflinger, whatever Bacon got, it was not Viscolac, which the trade at once recognized as new. The Atlas Company itself was explicit as to this; in its report of April, 1922, it said that "to obtain such a finish in one or two coats with material thinned with an equal amount of thinner had been unheard of in lacquer finishes until Viscolac came on the market." Bacon had not succeeded, and the difficulties were plainly greater than appear from the known relation between coverage and viscosity. Though that was understood, it had not been enough to lead two competent experimenters to success. We have already said that it does not follow that the secret lay only in the critical limit of viscosity; and that it seems, at first blush anyway, rather improbable that this alone should have proved the cue. And yet again, when all the facts are considered, nothing else appears to have changed. The defendant suggests that new and economical methods of reducing viscosity had appeared, as for example Pitman's. But the very process which it uses itself had been patented at least as early as 1910, and while the Hercules Company had not known the earlier disclosures, they were available to the art. An invention must be judged by what was in the public demesne, as well in the inventor's favor, as against him. Nor was there any new discovery in softeners to account for success, as we have already said. True, all that Flaherty did was to carry out what was already known, and by trial and error fix the limit which should be observed.

If genius is demanded, surely he was no inventor; rather he was one of those who, taking the knowledge at hand, worked out its implications in the laboratory. There are indeed expressions in the books which, taken literally, would exclude such work from the protection of the patent laws; there are others which would not. But we deprecate such a priori rules for determining invention. Nothing has tended more to confuse and obscure the issue than the attempts of courts to lay down generalities. The issue does not admit of such treatment, for invention is always a function of the particular situation, of the conditions which preceded and followed the appearance of the composition or the machine. That this is a treacherous standard is true enough, but at least it is less treacherous than easy absolutes which fit the immediate occasion, but lie athwart any realistic treatment in the next case. At any rate to this approach we stand committed. O'Rourke Engineering Construction Co. v. McMullen (C. C. A.) 160 F. 933, 938; American Stainless Steel Co. v. Ludlum Steel Co. (C. C. A.) 290 F. 103, 105; Kirsch Mfg. Co. v. Gould Mersereau Co. (C. C. A.) 6 F. (2d) 793; Dubilier Condenser Corp. v. New York Coil Co. (C. C. A.) 20 F.(2d) 723, 724; Electrical Engineers' Equipment Co. v. Champion Switch Co. (C. C. A.) 23 F.(2d) 600, 604; R. Hoe & Co. v. Goss Printing Press Co. (C. C. A.) 30 F.(2d) 271, 274; United Chromium Co. v. International Silver Co. (C. C. A.) 60 F.(2d) 913, 916, 917. And we have endeavored in adopting it to follow the implications of the Supreme Court. Webster Loom Co. v. Higgins, 105 U. S. 580, 581, 26 L. Ed. 1177; Potts & Co. v. Creager, 155 U. S. 597, 607, 15 S. Ct. 194, 39 L. Ed. 275; Diamond, etc., Co. v. Consolidated, etc., Co., 220 U. S. 428, 435, 31 S. Ct. 444, 55 L. Ed. 527; Eibel, etc., Co. v. Minnesota, etc., Co., 261 U. S. 45, 68, 43 S. Ct. 322, 67 L. Ed. 523.

The learned District Judge particularly relied upon De Forest Radio Company v. General Electric Co., 283 U. S. 664, 51 S. Ct. 563, 75 L. Ed. 1339, and so does the defendant. That was a case which superficially somewhat resembled the case at bar, and where some of the language, broken from its context, looks in the defendant's favor. We do not think that upon close scrutiny it goes so far as appears. Langmuir, the inventor, had utilized the current knowledge of the art in 1913, to claim as his invention the exhaustion of the occluded gases in a vacuum bulb, by which he reduced its ionization point in use. It was known that the phenomenon of ionization, though in some respects it assisted the development of the current discharge in a radio receiving circuit, made it unsteady and demanded nice adjustment for each bulb. Thus it became desirable to reduce it so far as possible, allowing the electrons to pass in vacuo from the filament to the plate. All this, as we have said, was well known and had been declared in scientific periodicals, especially by Lilienfeld. At the time when Langmuir disclosed his invention, which was merely for a completely exhausted bulb, there was no demand for anything of the sort; the art did not yet need it. Thus Langmuir had merely put in practical form, before they were needed, the scientific discoveries of others; indeed the court thought that De Forest had anticipated him even in that, though this was not its chief reliance. The opinion must be read with this in mind, and when so read appears inapposite. However obvious Langmuir's invention might seem to be, we have no reason to suppose that, had he been the first to succeed of several experimenters, working over a substantial period after the practical need had arisen, he would have failed.

■ Therefore, we are disposed to regard Flaherty's work in this case as invention. From him dated in fact a contribution whose value cannot be denied; to him must be attributed the first practicable low viscosity lacquers, whose desirability had been known long enough to make them the subject of much experiment; we can discover nothing but the control of viscosity which achieved success, obvious as that may now seem; that information turned out to be enough to direct the art. There may be some illusion in all this, of which we are not aware, but as the case stands, to assimilate his work to mere craftsmanship would be a denial of the facts before us. Moreover, the patent has been recognized by fifty-two manufacturers who have taken licenses. True, this must not be pressed too far; it is easier to pay tribute than to fight, and a substantial part of the trade has combined in this contest. But courts have always treated such recognition as a relevant consideration and certainly it may not be altogether disregarded. Thropp's Sons Co. v. Seiberling, 264 U. S. 320, 329, 330, 44 S. Ct. 346, 68 L. Ed. 708.

Flaherty originally claimed a higher limit of viscosity than 4.6 seconds. Not only was he forced to disclaim after suit brought, claims to 16.2 second nitro-cellulose, but his specifications still contain the statement that "generally" the critical limit is as high as

that (page 3, lines 2–9). He was more acquisitive than he should have been, as inventors often are; but that ought not to take away from him his invention, if he made one. The claims in suit are limited to 4.6 second viscosity, and that is what he actually found. The very purpose of the disclaimer statute is to allow retraction, in the absence of bad faith, which is not here asserted. That he should have wrongly guessed that the limit was higher, does not abate from the fact that he has found the actual limit; that which the art has now adopted. He could not be expected to set a definite figure; there is none, for viscosity may vary even below his limit. But he did set that limit definitely, and in a chemical patent that is all that is required. The supposed vacillation in his conception seems to us to be no more than is permissible to one who has in fact discovered a chemical invention of substance, but who is in doubt whether it may not extend beyond his experimental verification. Somewhere no doubt he must set his bounds at his peril, and that he did.

The defence of abandonment we need not consider. The District Judge thought it without merit and so do we. We are content to accept his disposition of that issue as our own.

Decree reversed.

## On Rehearing.

### PER CURIAM.

■ We have again examined the record as to Doerflinger's prior use in 1913–1919, and are still of opinion that it was not adequately proved. We may assume that he did on occasion reduce viscosity below Flaherty's limit, but what he used, except experimentally, was solution 415, and the viscosity of that is most uncertain. Doerflinger used acetic acid to stop the reaction of ammonia, the reducing agent; the more ammonia that combined, the greater the reduction in viscosity. He added enough acetic acid to neutralize two-thirds of the ammonia; and after its addition the solution was neutral, not acid. The defendant's experts allowed either all the ammonia, or much more than a third to combine; Schlatter, one of plaintiff's witnesses, after adding the amount of acetic acid specified by Doerflinger, found that the result was acid; more than a third of the ammonia had been used. Naturally there was a greater reduction of viscosity. Clark, the other, did not test to see whether the solution was neutral or not. Moreover, the temperatures of Doerflinger's

experiments could not be reproduced, as they were not accurately measured at the time, and, besides, his memory was not reliable after nearly twenty years. Therefore, whatever Doerflinger did, it is not definitely proved that he discovered a lacquer suitable in other respects, and of thick covering, produced by keeping within 4.6 seconds' viscosity. If in his experiments he chanced upon some such, it was not an anticipation, unless he came to rest upon a formula which contained the elements of the patented composition. Lacquer made under formula 415 made no impression upon the art, either by its appearance or disappearance; and it is improbable that this would have been so, had it been that composition which in 1921 was at once recognized as a new and important advance. This circumstance fortifies our doubts as to the identity of the two, as it did before.

As to Bacon's use, it is clear that, regardless of Flaherty's date of invention, Admantine X was not the patented product. It was the culmination of a series of experiments originating in Admantine resin, which Bacon thought would be a substitute for true resins. It contained none, because at that time Given says that they did not believe that ordinary resins could be successfully combined with low viscosity nitrocellulose. Probably in 1919 they had thought that it could, but the results had not been satisfactory, and, when Bacon took up the investigation again in July, 1920, they did not believe that he had yet solved the problem, certainly as to wood finishes. As to lacquers of other kinds, if indeed the difference is as important as the defendant would have us believe, his results, judging by his reports, were still experimental and somewhat equivocal. For example, the report of October 27, 1920, was based upon high viscosity nitrocellulose, with which they were therefore still working. We cannot regard all this, taken with the later omission of all resins, as compatible with more than tentative earlier results. Besides, the declarations of the Atlas Company itself, when Viscolac appeared, ought to lay any doubt that what Bacon succeeded in producing was not Flaherty's lacquer.

■ Upon the issue of invention we have little to add to what we said before. Except for claim 1, all the claims are for compositions of nitrocellulose and resin; most of them with a softener added. The invention, so far as we need consider it, is not for a low viscosity nitrocellulose; not even for a lacquer made of low viscosity nitrocellulose. Our emphasis upon the new element in our opin-

ion has apparently misled the defendant into supposing that we thought the patented lacquer was only a nitrocellulose product. It was not; it was a lacquer made with gums or resins, and normally with a softener. Bacon at least had been led away from such a lacquer, as we have just said; he thought that it would not be tough, hard, and adhesive. Whether the art generally supposed so, does not appear, but such a lacquer with great covering power would have got wide acceptance. If Flaherty did no more than disabuse the art of a misconception, it is evidence of originality; most of us persist in what we are accustomed to believe. Though all he did was to carry forward the existing knowledge that lower viscosity would result in greater coverage, other competent persons had tried to use that knowledge; the stimulus to success was great, and the art had been either strangely inert, if the combination was obvious, or else obsessed with a belief that low viscosity was impracticable. The result was a new and unexpected product, recognized as such, and used to much advantage. We know of no rigid doctrine, divorced from those practical considerations which rightly or wrongly are basic in the patent law, that forbids to such an advance the name of invention. If authority is needed, Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868, will serve. There it was known that by degenerating starch its absorptivity would diminish. All Perkins did was to stop the process before it became dextrine, which gave bad adhesion; and that was an invention, though he did not claim it. The situation is here reversed; instead of stopping a known process to get a new result, Flaherty extended one. That his limit is not absolute is no objection; though at first hazy as to the precise boundaries, he had always fixed a safe upper limit, and that was enough. Nor do we agree that, at least on this record, we were wrong in saying that there is a lower limit to which viscosity should not extend; it is true that the resulting brittleness can be corrected, but there is at least some evidence that the necessary softeners make the lacquer impracticable. In any case, the point is unimportant, for no lower limit is necessary to the validity of the patent, and we have not found that there was any.

We did not mention Carlsson and Thall's patent, because it seemed to us irrelevant, since it added nothing to Bacon's work. The specifications are only for the preparation of low viscosity nitrocellulose. The last two claims, which were borrowed from Bacon, do indeed imply that such nitrocellulose may be used for lacquers; but the question whether the nitrocellulose described was to be used alone, or made an ingredient with resins and the like, is left wholly at large. This at best left the art just where Bacon's own experiments left it. Unless we beg the whole question by assuming that the unanswered question was unimportant, the disclosure was irrelevant; and, even if we do not, it would scarcely be full enough.

We cannot see that Underwood v. Gerber, 149 U. S. 224, 13 S. Ct. 854, 37 L. Ed. 710, affects the validity of claims 12 and 17; it did not hold that a single patent might not contain claims both for a composition of matter and for articles in or on which it was used. It is not indeed apparent how a patentee gains anything by such claims; the article is already covered by claims for the composition, if it contains the composition. On the other hand, though such claims may be idle, they do not expand the monopoly, which covers all uses of the composition anyway.

We failed to notice that the disclaimer included lines 2 to 9 of page 3, but the argument is stronger with these out.

We adhere to our original decision, and the decree is reversed.