RUBBER-COATED HARNESS-TRIMMING COMPANY v. WELLING.

Letters-patent No. 37,941, granted March 17, 1863, to William M. Welling, for an improvement in rings for martingales, are void for want of novelty, being merely for a product consisting of a metallic ring enveloped in a composition of ivory or similar material.

APPEAL from the Circuit Court of the United States for the District of New Jersey.

The facts are stated in the opinion of the court.

*Mr. J. C. Clayton* and *Mr. H. Q. Keasley* for the appellants. *Mr. Frederic H. Betts, contra.*

MR. JUSTICE HUNT delivered the opinion of the court.

William M. Welling brought this suit in the Circuit Court against the Rubber-Coated Harness-Trimming Company and others, alleging an infringement of his letters-patent No. 37,941, bearing date March 17, 1863, for an improvement in rings for martingales, and recovered damages. The company thereupon appealed to this court.

Welling's patent bears date of March 17, 1863, and recites that a previous patent to him described a particular mode of making factitious ivory, out of which billiard-balls and rings of various kinds were manufactured, and states that his present invention does not relate to that particular composition, but that "the nature of my said invention consists in the employ-

ment of a metallic ring within a ring formed of artificial ivory or similar materials, for giving strength to the same, thereby producing a new article of manufacture."

His method of proceeding is as follows: —

"In order to make my improved rings, I take a ring of metal, such as shown at *a*, or said ring may be formed by punching out a washer from a sheet of metal, or in any other suitable way. I take the amount of artificial ivory composition, and by dies or by hand cause the said composition to completely envelop the said ring with as much uniformity as possible, as at *b*; and, to give the exterior finish to the same, press and solidify the mass of composition around the ring by means of dies, and in so doing any plain or more or less ornamental shape may be given to the said ring, or the surface thereof. My ring is thus made of the desired ornamental appearance, while great strength is attained at very little cost."

His claim is in these words: —

"What I claim and desire to secure by letters-patent is the ring for martingales, &c., manufactured as set forth, with a metal ring enveloped in composition, as and for the purposes specified."

In ascertaining the construction to be put upon this patent, the state of the art is a legitimate and necessary subject of consideration.

1. The fact that metallic rings covered with a composition such as lacquer or varnish, rubber, enamel, or glass, had been in use for many years before Welling's invention, is clearly proved, and is conceded in the briefs on both sides. In most instances, these coverings were applied and secured first by the hand of the operator, and then by machinery.

2. It is proved by witnesses, and shown by the patents hereafter referred to, that prior to his invention dies were also made use of in the manufacture of pipes or rings upon iron cores. Elliot, an expert witness, says, in reply to the question: "Is it a part of your knowledge of the state of the art of manufacturing articles of composition or plastic materials, that pipes of lead composition have been formed upon iron cores by pressure in dies?" "It is." Again: "Do you mean to say, in the manufacture of rings, that dies were well known prior to the invention in suit? *Ans.* I believe rings were formed in dies prior to that time, but without metal cores."

Hedrick says : " It was not new two years before the date of Welling's application to make a martingale-ring by covering a metallic ring with a shell of plastic material which could be moulded or pressed thereupon and afterwards hardened."

The English patent issued to Moses Poole, dated Oct. 1, 1852, and of which the specification is dated March 30, 1853, was referred to by a witness, but was not given in evidence. We therefore pass it without comment.

The English patent of 1851, to Newton, referred to in the testimony, recites : —

" When it is desired that the compound of caoutchouc or gutta-percha shall serve as a covering to the iron or other substance, a thin sheet of the compound, sometimes one thirty-second part of an inch in thickness, or less, is pressed with great care upon the iron or other substance, so as to expel all air from between the adjoining surface, and to cause the most perfect union and adhesion ; the coated article is bound with strips or ribbons of cloth, or other suitable material, whereby the compound is kept in close contact with the article during the process of hardening. The combined materials thus treated will be found to possess the qualities desired, the iron or other substance giving strength, and the compound giving a hard and durable surface. In this way may be produced many articles used in and about harness or carriages, such as saddle-trees, buckles, terrets, bits, stirups, martingale-rings, dasher-irons, and articles intended to be used as furniture," &c.

" Another plan consists in so treating the compositions while in a plastic state that they will harden into any desired shape. . . . For this purpose, the compounds of caoutchouc or gutta-percha, before described, are taken in the plastic state, and cut or pressed or otherwise formed into the exact shapes which it is desired they shall retain after vulcanization."

In the English patent to Edward Benton, of 1843, the rings, terrets, and other parts are covered with an enamel or vitreous composition, of which the composition and the manner of applying it to the ring are described ; and in speaking of these linings it is said, " The said linings are formed in moulds by processes well understood," &c.

Similar language is used in the English patent to Barnwell

& Rollauson, dated 1860: "We make toys, &c., by employing moulds or dies of any suitable material for which our composition has no affinity, or to which it will not adhere."

A die is a piece of metal on which is cut a device which by pressure is to be placed upon some softer body. A mould is a receptacle into which a softer material is injected, to take its shape when hardened. Both dies and moulds are there spoken of; and it thus appears that not only were there well known and in extensive use, before Welling's patent, iron rings, tubes, pipes, toys, and other articles of manufacture, enveloped in and surrounded by glass, enamel, rubber, and other like substances, but these coverings had been applied and ornamented by means of moulds or dies.

As we read Welling's patent of 1863, it is for a product, and not for a process.

In 1857, he obtained letters-patent No. 17,999, for the manufacture of artificial ivory. He gives the proportions of white shellac, of impalpable white, of ivory dust and camphor, which are to be heated, thoroughly incorporated, and brought into heated moulds for the manufacture of various articles. His claim in that patent is for forming artificial ivory, by thoroughly mixing the articles specified, or others having equivalent properties, while under the operation of heat, substantially as specified. The patent was for a product resulting from the materials and proportions described, to wit, factitious ivory.

Having the advantages of his manufactured ivory strongly impressed upon his mind, he makes, in 1863, a more specific application of this invention of ivory to the production of martingale-rings.

He says in his description, "I have invented and applied to use a certain new and useful improvement in rings for martingales." He does not here claim to have invented a substance or material or composition; he claims no benefit of any process to reach his result, but claims a ring only. He claims a product; and all else is a description of the mode of obtaining that product, which would enable a skilled mechanic to make the article, and which the law requires him to set forth in his specification. Of this character is the statement that the composition envelops the ring by means of dies or the hand, and

that an exterior finish and ornament is produced by solidifying by the means of dies.

Again, he says: " The nature of my invention consists in the employment of a metallic ring within a ring formed of artificial ivory, or similar materials for giving strength to the same, thereby producing a new article of manufacture," &c.

A metallic ring within a ring of factitious ivory is the article to be produced, and that is the nature of the invention.

Nothing can be more specific than the summing up as to the nature of his invention by the patentee, when he says, " What I claim and desire to secure by letters-patent is the ring for martingales, manufactured as set forth, with a metal ring enveloped in composition, as and for the purposes specified." A metal ring enveloped in composition would seem to be the plain subject of the monopoly, the other language being merely illustrative of or supplemental to the main idea.

What, then, is the product thus secured by his patent?

Welling gives this construction to his patent: " I claim (under my patent) all compositions for covering martingale-rings or rings for harness." " Do you claim that all metallic harness-rings covered with composition of any kind are subject to your patent? I do most certainly."

If this is the true construction of the patent, it cannot be sustained under the evidence showing the use of covering of harness-rings by various compositions, and patents providing for such use, prior to his patent.

Another construction claims that the patent covers a ring having an iron core covered with a plastic composition, if and provided the article is finished by dies. This is the view of the appellee's expert witness, Elliot, who states expressly that, if made without the use of dies, he does not consider the article within the patent.

Nearly allied to this idea, if not identical with it, is that of the judge who tried this case at the circuit. He says of Welling's patent: " His instrumentalities were all old, — an iron ring, a plastic composition, and a die; but, so far as appears in the case, they were new in combination. If his patent had been simply for a metallic ring, covered with any compound capable of being moulded, or with factitious ivory or similar

materials, it would have been void for want of novelty. If it had been for the use of the die in pressing and solidifying plastic substances generally, it would have been probably anticipated in this regard by the English letters-patent to Barnwell & Rollauson of 1860, in which such use of dies is plainly indicated. But the invention is for a combination; and the combination is a metal ring surrounded with some plastic composition, like artificial ivory, of such a nature that it is capable of being compressed, solidified, and polished by the action of the dies, and which is in fact subjected to such action, whereby a martingale-ring is produced with an exterior surface more durable and more highly polished than had before been obtained by different processes of manufacture, and at greater cost."

We think the evidence shows that this combination, if it is entitled to that rank in mechanics, as well as the ring and the compound, is old. There is, in truth, no combined action. The iron core is used as a basis, the covering is of a pliable composition, and it is pressed or stamped by dies or moulds. All this is done separately, by no combined action. This is just as much, and nothing more, than is described by the witnesses, and by the patents prior to Welling's. It is simply the application and the action of old and well-known modes and materials in an accustomed manner. It is a case of aggregation, not of combination.

Can the appellee recover in this action upon a patent for this product, to wit, a metal ring enveloped in a composition of artificial ivory or a similar material?

It is evident, from what has already been said, that a patent for the manufacture of a metal ring enveloped in a composition of ivory or similar material is void for the want of novelty.

Such is the testimony of the expert witnesses on both sides, as well as the inevitable result from an examination of the English patents heretofore referred to. Indeed, we do not understand the counsel as contending that the patent can be sustained if this is held to be its construction.

Upon the whole case, we are of the opinion that the decree must be reversed and the case remitted to the Circuit Court, with directions to enter a decree dismissing the bill of complaint, with costs; and it is

*So ordered.*