## E. I. DU PONT DE NEMOURS & CO. v. GLIDDEN CO.

No. 5544.

District Court, E. D. New York.
Dec. 7, 1932.

Charles Neave, Maxwell Barus, A. C. Neave, and Paul R. Ames, all of New York City (J. B. Cunningham, of New York City, of counsel), for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis, Arba B. Marvin, Daniel V. Mahoney, and George E. Faithfull, all of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit for relief by injunction and damages for the alleged infringement of reissue patent No. 16,803, to Edmund M. Flaherty, assignor to E. I. du Pont De Nemours & Co., for low-viscosity lacquer and film produced therefrom, reissued November 29, 1927, upon an application for reissue filed September 19, 1927. The corresponding original patent was granted May 24, 1927, upon an application filed May 23, 1921.

The plaintiff's title to the patent, the incorporation and places of residence of the parties as alleged, and the jurisdiction of the court are admitted and notice of infringement proved.

The sale by the defendant of nitrocellulose enamel containing nitrocellulose whose viscosity characteristic is below the limit defined in the claims of the patent is admitted, but there is no reference in the stipulation as to the source of the nitrocellulose base used in the defendant's lacquers, or to the

method by which the viscosity of its nitrocellulose is reduced.

The defendant purchases its nitrocellulose from the Hercules Powder Company.

The viscosity characteristic of the nitrocellulose so purchased is reduced by boiling in water under pressure without chemical reducing agents. This is an old method wholly different from the chemical viscosity-reducing treatment disclosed in the Flaherty patent.

The patent in suit is for a product and not for a method or process, and as I understand the plaintiff's position, it does not contend that defendant follows or imitates in any way the method of reducing the viscosity of nitrocellulose disclosed in the patent, but insists that the method by which the viscosity of the nitrocellulose is reduced does not make any difference.

The charge of infringement is based solely upon the fact that the defendant uses a viscosity nitrocellulose base lower than the upper limit defined in the claims of the patent in suit.

This suit is based upon claims 2, 3, 6, 8, 9, 12, and 17 of the patent in suit.

Claims 2, 3, 6, and 9 are directed to the lacquer.

Claims 8, 12, and 17 to the coating resulting from the use of the lacquer.

All of the claims in suit specify the presence of the resinous ingredient, and all of them except claims 8, 9, and 17 also specifically refer to the presence of a softener.

Claims 3 and 17 are specific to pigmented lacquers as distinguished from clear lacquers.

All of the claims in suit specify that the viscosity characteristic of the nitrocellulose is "below" "or less than" a defined standard.

In claims 2, 3, 9, and 12 the standard is defined with reference to the viscosity of a solution consisting of 16 ounces of the nitrocellulose in a gallon of pure ethyl acetate.

In claims 6, 8, and 17 this standard is defined with reference to the viscosity of a 25 per cent. solution of the nitrocellulose in the particular mixed solvents specified in example 1 of the patent.

All the claims in suit refer to the viscosity characteristic of the nitrocellulose.

The two definitions of the standard mean the same thing, although in one case the viscosity of the solution referred to in the definition is 25,000 centipoises, and in the other

case the viscosity of the solution referred to in the definition is 1,200 centipoises.

This is true because while nitrocellulose itself has no viscosity, it has the characteristic or capacity of making any solution, in which it may be dissolved, more or less viscous, and the extent to which it makes a solution viscous depends partly upon the particular solvents, and partly upon the concentration of the nitrocellulose in the solvents.

The centipoise is a unit used by the United States Bureau of Standards for the measurement of viscosity, and the bureau keeps on hand solutions of viscosity measured in centipoises.

Any one who desires to determine the viscosity of an unknown solution can on request obtain from the Bureau of Standards a sample by specifying the solution of viscosity he desires and compare it with the unknown solution by means of suitable instruments.

The Stormer viscometer referred to in the patent is a suitable instrument for that purpose.

The patentee in the patent in suit states as his purpose the production of an improved low viscosity nitrocellulose lacquer, and then defines his invention or discovery as follows: "According to my invention pyroxylin solutions, and particularly lacquers, having an abnormally high nitrocellulose content in conjunction with a suitably low viscosity are produced by subjecting pyroxylin mixtures of the character hereinafter described, for a prolonged period, say from one to three weeks, preferably at ordinary room temperature, to the action of a metal salt of a weak acid, for example an alkaliforming metal acetate. The discovery of the action of salts of this kind on the viscosity of pyroxylin solutions is described in the patent of Earle C. Pitman No. 1,636,319, and the application of this discovery to the reduction of viscosity of pyroxylin solutions is claimed broadly therein. By a particular application of this discovery to high percentage pyroxylin solutions, I have found it practicable to produce solutions, such as lacquers and colored enamels, of such a high pyroxylin content that they will deposit in two coats a film as heavy and satisfactory as the ordinary solutions do in four coats or more."

He then in detail states two specific examples in both of which the "metal salt of a weak acid" employed as a chemical viscosity-reducing agent is sodium acetate; and points

out that by following the procedure set forth in these examples, a 25–40 per cent. pyroxylin solution may be obtained, having a viscosity below 25,000 centipoises at 28° centigrade.

The next two paragraphs name a number of other "metal salts of weak acids" that may be used as a viscosity reducer in the place of sodium acetate, and a number of other well-known solvents of nitrocellulose that may be employed.

These paragraphs are not statements of Flaherty's discovery, but of Pitman's patent, No. 1,639,619.

The specification contains no further disclosure of methods or of alternatives, but the remainder consists of a number of statements differentiating the "new lacquer" from prior lacquers made from "cellulose nitrate which has not been subject to the above subscribed treatment with sodium acetate or a similarly functioning agent," all of it beyond the words last quoted having been added at various times during the prosecution of the application.

The substance of these statements is that lacquers made from nitrocellulose treated with Mr. Pitman's viscosity-reducing agents will, as in the examples given, contain more solids at any given viscosity than the usual nitrocellulose lacquers, by virtue of the fact that the viscosity characteristic of the nitrocellulose has been reduced, and that by reason thereof the resulting lacquer has greater covering power, and the desired thickness will be produced by a smaller number of coats.

The patentee discloses in the patent in suit, as a novel and patentable idea of means, his discovery that the application to the making of lacquer films of Mr. Pitman's method of reducing the viscosity characteristics of nitrocellulose solutions will produce superior films.

The alleged invention or discovery of the patent in suit, as I read the patent, is the use as a lacquer, or in a lacquer, of a nitrocellulose solution in which the viscosity of the nitrocellulose has been reduced by Mr. Pitman's method.

The defendant contends that this was not a patentable discovery or invention.

To determine whether the defendant's contention should be sustained, we must first determine how the substitution in lacquers of nitrocellulose treated by Mr. Pitman's method changed the nature of the resulting lacquer, whether in kind or merely in degree.

That the viscosity of nitrocellulose could be reduced in various ways was known for many years before the filing of the original application of the patent, of which the patent in suit was a reissue, and nitrocellulose lacquers, made by dissolving nitrocellulose in its usual solvents in such proportions as to produce a solution that may be applied either by spraying, brushing, or dipping, have been manufactured and sold for many years. When so applied, the solution is spread on the surface to be coated, the volatile solvents evaporate, and the nitrocellulose is deposited as a transparent film on the surface.

It is therefore of importance to the user that there be a maximum of pyroxylin per unit of solvent, as the solvent in most cases is all lost by evaporation during the drying of the film of pyroxylin.

It was common practice long before Flaherty to add gums, resins, and pigments to these nitrocellulose solutions, to give the lacquers or enamels the properties these added substances impart.

In 1911, it was known that nitrocellulose, which is a complex organic compound, does not have a fixed viscosity characteristic. Its viscosity characteristic (i. e., the extent to which it imparts viscosity to a given quantity of a given solvent) depends upon the starting material from which the nitrocellulose is manufactured, the way in which it is manufactured, and its treatment after manufacture, and that the higher the viscosity characteristic of the nitrocellulose used in a lacquer, the less will be the quantity of nitrocellulose that may be added to a product of given fluidity; and the lower the viscosity characteristic of the nitrocellulose, the more may be added to the solvent without exceeding the desired viscosity of the lacquer. See Worden's Nitrocellulose Industry, pp. 47, 48 and footnote 3, Defendant's Exhibit F.[†]

† * * * From the determination of the hygroscopicity of 65 samples of nitrocotton in which the percentages of nitrogen varied from 8.20–13.21—practically the whole range of nitrates of industrial value—it was found that the sum of the hygroscopic moisture and the nitrogen content was a constant in all cases with a value of about 14.6. This constant remained unaltered when the nitrate was subjected to various chemical, physical and mechanical treatment.[1]

The hygroscopic moisture was found to have no relation to the solubility of the cellulose nitrate in ether-alcohol, depending entirely on the

[1] Including pulping, solution, and gelatinization; treatment with dilute acids or alkalis; partial elimination of the nitrogen; and complete denitration followed by renitration.

A change in the viscosity characteristic of the nitrocellulose base does not change its functional relation to the other constituents of the lacquer, as they co-operate in the same way to produce the same result without regard to the change.

That the plaintiff may have discovered and invented a new process for the making of lacquer is not proof that it has invented a new lacquer, as the word "new" is used in the patent law.

Nor is the fact that a new nitrocellulose, with a new viscosity characteristic, is used

proof of the production of a new lacquer, as the word "new" is used in the patent law, as the lacquer produced is the same old lacquer with the same mode of operation; the only difference being the increased covering power due to the lower viscosity of the nitrocellulose.

The difference is in degree and not in kind, and in my opinion the product is not broadly patentable. Union Paper Collar Co. v. Van Deusen, 23 Wall. 530, 560, 563,

---

percentage of nitrogen. Unstable nitrates show abnormally high values, which, however, are reduced to the normal when the products are rendered stable by long boiling with water.[2]

**Variations in Solubility and Viscosity.** There is apparently no relation between the nitrogen content and viscosity of the nitrocotton when dissolved in its usual solvents, and hence attempts to duplicate the viscosity of a certain product is impossible from considerations of acid mixtures and length of immersion. In general the fluidity is always greater with increased temperature of nitration,[3] other factors remaining the same. And inasmuch as with rise of temperature the yield decreases, it follows that a low viscosity is obtained only at the expense of the yield, i. e., the greater the fluidity, the less obtained. The various degrees of solubility are produced according to the strength of the acids used and length of immersion of the cellulose, while the viscosity results from a manipulation of the temperature of the nitrating bath. It is quite possible to produce from the same acid mixture and same source of cellulose two samples of nitrocotton, where the one formed at a lower temperature (30–35°) will be but half as fluid as the other sample nitrated at a higher (55–65°) degree, amyl acetate, say, being

used as the solvent in both instances. In general if the proportion of sulphuric to nitric acid is increased over 3:1, the solubility in ether-alcohol, acetone, and amyl acetate increases, while the percentage of nitrogen slowly falls, although it is impossible to foretell the degree of solubility from the nitrogen percentage alone. It is possible to occasionally produce cellulose nitrates soluble in 95% ethyl alcohol where pure nitric acid or nitric acid containing less than 10% sulphuric acid is used, their nitrogen content approximating that of octonitrocellulose (11.13% N).[4] The commercial preparation of nitrocottons for films and lacquers is a careful adjustment of nitration conditions to embody the minimum of temperature to produce the highest yield of lowest viscosity, rather than an endeavor to obtain the greatest weight of nitrate which will merely dissolve in the solvent. In any solution where the liquids consist of both a solvent and non-solvent (amyl acetate and benzine) the viscosity increases as the point of precipitation is neared, due to preponderance of the pyroxylin non-solvent (benzine). It would appear from the literature on the subject that a mixture of 3 parts ether to 1 part alcohol is the more commonly employed solvent for technical use. This, however, is not true, amyl acetate and commercial wood alcohol (containing acetone) having practically replaced the ether-alcohol formerly used. * * *

---

[2] By further desiccating over sulphuric acid, after drying at 40° under ordinary conditions, all the cellulose nitrates lose a further quantity of water, the sum of the hygroscopic moisture and nitrogen percentage being then no more a constant, varying with the proportion of nitrogen to a greater extent. By varying the temperature at which the products were exposed to a moist saturated atmosphere from 25-15°, while adhering to the former method of drying at 40°, the hygroscopic moisture was found to be considerably increased.

The "normal hygroscopic moisture," as determined at Neu Babelsberg (Cross and Bevan, "Researches on Cellulose," 2, 74), consists in desiccating in an ordinary oven kept at the constant temperature of 40°±1°. It is then exposed to an atmosphere saturated with moisture at 25°, the temperature being maintained ±0.5°. At its saturation point the cellulose is weighed in specially constructed balances in which the same conditions of temperature and moisture are maintained. This arbitrary method is selected because the cellulose nitrates may be safely dried at this temperature without fear of decomposition.

[3] The question of viscosity is commercially of great import. Bronzing liquids and heavier pyroxylin lacquers, which are applied by dipping the material to be coated into them, must be made to a given "flow" or fluidity in order that a uniform coating may be applied. Where articles of hard-

ware are given a protective coating of these lacquers, if the fluid be unduly viscous, less of the excess lacquer will run off the surface before congealing; the coating will then be heavier than desired and more fluid required to coat a given number of articles. A satisfactory result is not attained by merely diluting the lacquer to the required viscosity with solvent, for then the amount of pyroxylin per given volume is decreased and the resultant film may be too thin for proper protection. It is for this reason that pyroxylin lacquer manufacturers blend various "batches" of nitrated cotton in order to obtain a desired viscosity with a given number of grams cellulose nitrate per liter. Just as it is correct to designate a cellulose nitrate as of a given nitrogen percentage and solubility (specifying the solvent), so also is it necessary in lacquer manufacture to produce solutions where a given weight per volume of nitrated cotton results in a solution of given viscosity. In the production of artificial textiles and photographic films, where also solutions of known viscosity are required, the evaporated solvents are but partially and imperfectly recovered. From motives of economy, therefore, a very fluid pyroxylin is used, that the maximum of solids may have the minimum viscosity and a given weight of pyroxylin may be deposited in the dry form, with the loss of the least amount of solvent.

[4] See Major D. Goebel, Z. ges Sheiss- u. Sprengstoffw., 2, 43; N. A. Stepanow, Tech. Sbornik, 17, 73.

23 L. Ed. 128; Hotchkiss et al. v. Greenwood, 11 How. 248, 266, 267, 13 L. Ed. 683; Smith v. Nichols, 21 Wall. 112, 118, 119, 22 L. Ed. 566; Milligan & H. Glue Co. v. Upton, 97 U. S. 3, 4, 6, 24 L. Ed. 985; Rubber-Coated Harness-Trimming Co. v. Welling, 97 U. S. 7, 10, 12, 24 L. Ed. 942.

Plaintiff relies strongly on General Electric Co. v. Laco-Philips Co. (C. C. A.) 233 F. 96; General Electric Co. v. Alexander (C. C. A.) 280 F. 852; and General Electric Co. v. P. R. Mallory & Co. (C. C. A.) 298 F. 579.

These suits were based on the Just and Hanaman patent on tungsten electric light filament.

I cannot agree with counsel for the plaintiff that in Just and Hanaman's time the idea that tungsten would be a good thing to use, if a filament could be made of it, was old. As I understand it, the properties of tungsten were not known at that time, and it had been passed over in an intensive search for new filament. General Electric Co. v. Laco-Philips Co. (C. C. A.) 233 F. 96, 101. Pure homogeneous tungsten did not exist, and no one knew what could be accomplished with it as an incandescent filament.

De Lodyguine had unsuccessfully experimented with tungsten as a filament, but not with pure homogeneous tungsten.

Under these conditions the belief, which was only a guess, came to Just and Hanaman, that tungsten might have valuable characteristics as an incandescent filament, if it could be produced in a pure and homogeneous state. They produced a pure homogeneous tungsten filament, and their patent for the product, however made, was sustained.

This is not the case in the instant suit, where it was commonly known in the art that lower viscosity nitrocellulose would produce a better lacquer because of its increased covering power, and those cases do not seem to me to be in point.

Evidence was offered in this case which plaintiff contends shows great commercial value of the Flaherty lacquer, and even if that be assumed as due to the Flaherty process, which I do not, that does not prove invention of the product. General Electric Co. v. Cooper Hewitt Electric Co. (C. C. A.) 249 F. 61, 70, 71.

Whether the Pitman method was an invention or not, it was not Flaherty's invention, and the lacquer made of the nitrocellulose, whose viscosity is reduced by that method, differs only from the old lacquers in the increased covering power of the substituted low viscosity nitrocellulose.

As has hereinbefore been shown, it was long known before Flaherty that the use of low viscosity nitrocellulose, in a nitrocellulose lacquer, would increase the covering power of such a lacquer, and a new and analogous use of an old thing is not invention, even though it effects results not before contemplated. Howe Machine Co. v. National Needle Co., 134 U. S. 388, 397, 10 S. Ct. 570, 33 L. Ed. 963; St. Germain v. Brunswick, 135 U. S. 227, 230, 10 S. Ct. 822, 34 L. Ed. 122.

The evidence, which it is unnecessary to recite, including Mr. Flaherty's own testimony, clearly shows that the art generally, and Mr. Flaherty himself, knew the relationship of the viscosity characteristics of nitrocellulose in lacquer to the covering power of the lacquer long prior to any date of the alleged invention of the patent in suit, and therefore the instant suit is brought directly within the ruling of De Forest Radio Co. v. General Electric Co., 283 U. S. 664, 51 S. Ct. 563, 75 L. Ed. 1339.

This would be true even if the contentions of the plaintiff were sustained by the evidence, which I believe they are not, that Flaherty taught an unprecedented low order of viscosity of a wholly different order from those previously used, and that the idea was thoroughly ingrained in the art, that nitrocellulose reduced in viscosity to the extent contemplated by the Flaherty patent could not be used in commercial lacquers.

The evidence does not sustain either of the plaintiff's said contentions, and, if it did, it would not justify the monopoly which the Flaherty patent asserts.

The knowledge of the relationship of cause to effect caused workers in the art to turn toward the production of lower and lower viscosity nitrocellulose for lacquers, and the product of each such lowering viscosity did not constitute invention, although the methods taught by them, for such reductions, may have shown invention, and certainly there was no invention which would justify a monopoly of all products of degrees of lowness below those previously used.

A careful consideration of the plaintiff's said contentions only results in confirming my opinion of the binding force of the ruling in De Forest Radio Co. v. General Electric Co., supra, in the instant suit. In that case the claims defined a degree of evacua-

tion such that the operation of the tube was substantially unaffected by positive ionization, where as the operation of prior tubes had been dependent upon ionization, and the Supreme Court, speaking of invention, said (pages 678, 679 of 283 U. S., 51 S. Ct. 563, 566): "Whether it is or not depends upon a question of fact, whether the relationship of the degree of vacuum within the tube, to ionization, and hence to the stability and effectiveness of discharge passing from cathode to anode, was known to the art when Langmuir began his experiments."

It was likewise contended in that case that prior to Langmuir, those skilled in the art supposed that ionized gas within the tube was what the tube depended upon for conduction of current.

This contention the court put aside, and found that the relationship of this degree of vacuum within the tube to the ionization, and hence to the stability, etc., of the tube was known, and consequently there was no invention in carrying the evacuation further than it had been carried before, whatever incidental results might follow.

In the instant suit, although plaintiff's counsel says that the degree of reduction contemplated by Flaherty's patent was unprecedented and characterized it as of a wholly different order, there is nothing to show it more than differed in degree from what had previously been done, or that there was more than a mere change in degree of a particular property possessed by it over other nitrocellulose lacquers in common, that is, covering power. No critical change was effected in the product.

The relationship of the viscosity characteristics of the nitrocellulose in lacquer to the covering power of the lacquer was well known to the art prior to Flaherty. I am therefore unable to distinguish the instant suit from De Forest Radio Co. v. General Electric Co., supra.

The suggestion of plaintiff's counsel that the idea was thoroughly ingrained in the art, that nitrocellulose, reduced in viscosity to the extent contemplated by the Flaherty patent, could not be used in commercial lacquers, does not seem to me to be borne out by the evidence, and certainly it is not supported by the evidence of the failure of attempts to use it in other, then more important branches of the nitrocellulose industry, as counsel for plaintiff contends, if by them it is intended to refer to the artificial leather industry, the artificial silk industry, and the celluloid and the photographic film industry, as the attempts to use them in such industries were made after and not before the low-viscosity nitrocellulose such as Flaherty used in lacquers had become a commercial product.

A close analogy between De Forest Radio Co. v. General Electric Co., supra, and the instant suit lies in the fact that in both, as originally presented to the Patent Office, the supposed invention was claimed as a method of producing the result, and that the change whereby the result alone was claimed, was during the prolonged prosecution of the patent and the period of the greater part of the development of the respective industries which it was sought to monopolize by the respective patents.

The original statement of invention, in the application filed May 23, 1921, referred to it as a new solution as well as a new process; but the subject-matter claimed was not the subject-matter now claimed, and it seems clear to me that the defendant's lacquer, charged to be an infringement, with a pyroxylin content of 13.2 per cent., not reduced by or containing Pitman's viscosity-reducing chemical or its equivalent, would not be included in the original claims.

After repeated discussions and amendments in its progress through the Patent Office, on August 28, 1923, the specification of the original patent was largely expanded and claims were presented for the subject-matter now claimed; but it was during the period intervening between the filing of the original application and the last-recited date that the manufacture and sale of lacquers containing nitrocellulose, having viscosity characteristics within the amended range, had become a substantial industry.

The plaintiff is seeking by the patent in suit to monopolize all lacquers with a viscosity characteristic below a certain arbitrary line, by whatever process produced, and there is no proof in this case, nor is it even asserted, that the line of demarcation is fixed upon a basis that it is critical in any sense.

What plaintiff is trying to accomplish is to draw a line that will exclude all viscosities of nitrocellulose previously used, and include for its benefit all viscosities not previously used.

The boundary of invention which the plaintiff is seeking to establish is not any particular quantitative change, producing a

new mode of operation, or any new or unexpected result, but simply previous use.

The evidence clearly shows that within the range defined in the claims, no critical degree or range of viscosity was made available by Flaherty, and that in the commercial manufacture of nitrocellulose lacquers, before the present low-viscosity nitrocelluloses were available, the viscosity characteristic of the lacquers used in a particular lacquer was a matter of choice, which varied throughout a wide range.

Since the present low-viscosity nitrocelluloses have become available, the manufacturers of nitrocellulose lacquers have continued to choose particular lacquers for their lacquer bases, throughout a range from ½ second cotton up to and into the higher viscosity cottons beyond the boundary fixed in the patent in suit; therefore the viscosity of the nitrocellulose chosen as a base for lacquer is not critical but depends only on the amount of covering power that the manufacturer desires to give to his lacquer.

The evidence shows that before the World War the present very low viscosity nitrocelluloses now obtainable were not commercially available to the lacquer manufacturer, and that after the War there was a demand for lower viscosity nitrocelluloses, and under its pressure these were produced by various manufacturers thereof, by various chemical and physical treatments after nitration, some by old methods and some by new methods.

If the new methods involved the exercise of invention, those methods would be patentable.

It may well be that Pitman's is such a method.

The patent could cover only the new method and its substantial equivalents.

No sound basis for a valid patent is afforded for the product by defining it as one in which the viscosity of the nitrocellulose is less than in any theretofore produced, and that, it seems to me, is the definition of the patent in suit.

Flaherty did not invent any method of reducing viscosity, but merely applied to use in lacquers Pitman's chemical treatment of nitrocellulose solutions to reduce their viscosity for a known purpose and with the expected result.

The disclaimer filed by the plaintiff emphasizes the lack of invention of the patent in suit.

The effect of it is merely to reduce the range of viscosities to a lower range than that claimed in claims 13 to 16, both inclusive, because it had been found that the use in lacquers of viscosities with the higher range was old. This clearly shows that the difference between the higher and lower ranges did not lie in any inventive concept, or any different functional relation of the ingredients to one another.

The statement added to the patent on February 17, 1927, that the nitrocellulose should not be "reduced to the point that the nitrogen content is degraded and the transparency and solubility of the cellulose nitrate impaired," is merely a vague statement of defects obviously to be avoided.

There is no evidence that any lower limit was discovered by Flaherty and none is described or claimed.

I will now consider the evidence of prior knowledge and use which the defendant contends shows anticipation.

At the outset it must be understood that defendant did not attempt to show prior knowledge of Mr. Pitman's idea of using "a metal salt of a weak acid," such as sodium acetate and its equivalents as a viscosity-reducing chemical agent.

That was not, nor was it claimed to be, the invention of the patent in suit.

The plaintiff contends that the fundamental idea in the patent in suit is that the nitrocellulose from which the lacquer is made shall have a very low or reduced viscosity characteristic.

The claims of the patent in suit cover the use in nitrocellulose lacquers of any and all nitrocellulose, provided only that its viscosity characteristic is such that a 25 per cent. solution in the particular mixture of solvents described in the patent will have a viscosity below 25,000 centipoises measured by a Stormer viscometer at 28° Centigrade. This, as I have hereinbefore stated, is equivalent to 1,200 centipoises in a 16-ounce ethyl acetate solution or 4.6 seconds by the Hercules falling ball test.

The relative measurements in centipoises of the Hercules seconds measurements which have been commonly adopted are found in the Stipulated Conversion Chart, Exhibit B.

The viscosity of a fluid will vary very much according to the temperature, and for the purpose of measurement, a centipoise is the viscosity of water at 20.2° Centigrade, and with this as a standard the viscosity of

the nitrocellulose solution may be measured on a Stormer viscometer.

The unit of measure of viscosity of Hercules is a second, and is measured by taking a glass tube about an inch in diameter, on which there are two marks ten inches apart, filling it with nitrocellulose dissolved in certain solvents specified as standard for the measurement, and then dropping in the tube a ball of standard size and weight, and noting the lapse of time between the ball's passing the upper mark and lower mark ten inches away, that is, in seconds.

There are also other standards of measurement, among which are the Parlin unit, also in seconds, the McMichael, and Tagliabue.

The terms "pyroxylin" and "nitrocellulose" are used interchangeably as meaning the same thing.

The trade distinction between lacquer and enamel seems to be that lacquer is a clear material, and that enamel is the same material with pigments in it, so that it should have color to it and be opaque, and have a body to it.

█ Claims 2, 3, 6, 8, and 9 of the patent in suit include in the "pyroxylin coating composition" different ingredients, to wit:

Claim 2, a softener and a gum;

Claim 3, a softener, a gum, and a pigment;

Claim 6, a resin and an oil;

Claims 8 and 9, a resin.

These, however, are well-known ingredients of pyroxylin lacquers, and add nothing of significance to the claims.

Claim 12, defines "an article covered with the lacquer"; and

Claim 17, defines a "rigid article coated with a colored enamel."

But no patentable novelty or invention is shown in applying the lacquer or enamel to an "article" or to a "rigid article." Underwood v. Gerber, 149 U. S. 224; 229, 13 S. Ct. 854, 37 L. Ed. 710.

Due to the large excess stocks of nitrocellulose and its solvents that existed in this country at the end of the World War, and the capacity to manufacture such things, there was following the War an intensive development of the industrial uses of nitrocellulose solutions, including their uses in the nitrocellulose lacquer industry and the commercial development of known methods, and perhaps also of new methods of reducing the viscosity of nitrocellulose to meet the demand of the lacquer industry for lower viscosity nitrocellulose, which it was known increased the covering power of nitrocellulose lacquer.

This development and not the patent in suit was responsible for the large increase in the use of low viscosity nitrocellulose in the manufacture of lacquers.

As an evidence of that activity, even beyond the confines of this country, we will first consider British patent, No. 128,659, of 1919, to Groves and Ward, for improvements in dopes or varnishes used in aeroplane construction, which patent discloses the advantage of using a low-viscosity nitrocellulose in varnishes, and a method of reducing the viscosity of the nitrocellulose for that purpose. The method proposed is not Pitman's, but that is not of moment here, as it is not Pitman's method patent that is in suit but Flaherty's product patent, which plaintiff contends covers a low-viscosity nitrocellulose, however produced.

This patent it is true was cited as a reference by the Examiner in the Patent Office, and was after argument by the patentee's solicitor put aside; but it now appears that the argument was based on a wrong premise and was erroneous, and that the reduction was within the Flaherty limits, which were 1,200 centipoises and not 400 centipoises.

I am not impressed by the testimony of plaintiff's experts, of a failure when they attempted to subject some solutions of celluloid made up by them to a treatment with calcium chloride and zinc chloride, to reduce the viscosity to within the arbitrary limits of Flaherty's claims, as celluloid is not the only material specifically referred to in that patent; on the contrary, the patent refers to "solutions of nitrocellulose, celluloid, acetyl cellulose and other cellulose esters in their solvents."

Whether by their method the viscosity could be reduced to within the arbitrary limits of Flaherty's claims is not to me the test of anticipation by the Groves and Ward patent, but rather that they taught the reducing of the viscosity characteristic of nitrocellulose by a chemical treatment, so that when the nitrocellulose was subsequently used in lacquer, it would have a greater covering power for a given quantity of solvent.

They therefore, by their method of reducing viscosity by the use of chlorides, produced low-viscosity lacquers, which was what Flaherty did with Pitman's method of reducing viscosity by the use of sodium acetate, and the Groves and Ward patent is an antic-

ipation unless the construction of the claims of the patent in suit should be limited to cover only the product of the method in said patent described, and this plaintiff contends cannot be done.

As an evidence of such activity in this country, let us consider United States patent to Carlsson and Thall, for improvement in process of reducing the viscosity of viscous solutions of nitrocellulose and other esters, granted April 19, 1921, on an application filed December 4, 1919.

This patent discloses a method of reducing by heating of the viscosity of nitrocellulose to any desired degree, and the application of such reduced viscosity nitrocellulose in nitrocellulose lacquers, and is the method used commercially by the Atlas Company in the manufacture of low-viscosity nitrocellulose lacquers. This patent says nothing about the addition of gums, resins, and pigments, which are the usual lacquer ingredients; but it does not seem to me that invention would be required, to add to a low-viscosity nitrocellulose these substances, in view of their common use with high viscosity nitrocellulose solutions.

This patent was also cited as a reference by the Examiner in the Patent Office, but the attempt to differentiate this patent from the patent in suit, on the ground that the method disclosed is not the Pitman method, does not impress me as having weight.

Flaherty's claims, plaintiff contends, are for a product, by whatever method produced.

Pitman's claims are for a method, and while Pitman, if his process was patentably new, might have had a patent for the product, I fail to see how that product could be patentable to Flaherty.

In any event, if the method of the Carlsson and Thall patent be different from that of Pitman, it is none the less an anticipation of the patent in suit, as it teaches the reduction of the viscosity of nitrocellulose to any degree, and the application of such reduced viscosity nitrocellulose in nitrocellulose lacquers, unless the construction of the claims of the patent in suit be limited to cover only the product of the method in said patent described, which plaintiff contends may not be done.

We will next consider what has been termed the Atlas-Zapon anticipation.

Prior to 1917, Richards & Co., of Stamford, Conn., was the holding company of Zapon Leather Cloth Company and Celluloid Zapon Company, which companies had for many years been engaged in the manufacture and marketing of lacquer and artificial leather.

In 1917, Richards & Co. was acquired by Atlas Powder Company.

About the middle of 1918, a research organization for such companies was started, and Mr. Bacon was assigned to work on lacquers. His work was supervised by Dr. Jones. Without reciting all the evidence, including failures and successes, it suffices to say that as a result of the work of Mr. Bacon, both he and Dr. Jones had knowledge of the desirability of using low-viscosity nitrocellulose to increase the covering power of lacquers, and that among the methods proposed for reducing the viscosity of the nitrocellulose, Mr. Bacon preferred the heat and pressure method to the pyridine treatment, and applied it successfully. It consisted in heating under 15 pounds' pressure, solutions of high-viscosity nitrocellulose in a mixture of butyl acetate, amyl acetate, and light acetone oil, and gave as a product a solution containing low-viscosity nitrocellulose. The heat and pressure treatment subsequently used by the Hercules Company, the Du Pont Company, the Atlas-Zapon Company, and others, is distinguished from the process employed by Mr. Bacon, in that in the later process the nitrocellulose is suspended in water and not in solution, and gives as a product a dry, clean, pure nitrocellulose.

As was then known and pointed out by Mr. Flaherty in his application for his patent No. 1,629,999, as issued, "The new pyroxylin solutions of high pyroxylin content may be used directly as lacquers with advantage. It is preferable, however, to add modifying agents such as castor oil, gums, etc."

Mr. Bacon continued with his work, and on the basis thereof the Atlas Powder Company, as assignee of Mr. Bacon, filed a patent application (Exhibit P). The subject-matter claimed therein is indicated in the original claim 1: "A process for making highly concentrated solutions of nitrocellulose having sufficient fluidity to be used as a lacquer or spray, which consists of treating a mixture of nitrocotton and solvent with heat or pressure."

On October 29, 1919, the Patent Office allowed the application, but subsequently withdrew it from issue and an interference was declared with Carlsson and Thall.

The interference was decided in favor of Carlsson and Thall, and on February 25, 1921, the Bacon application was finally rejected. The Atlas Powder Company pur-

chased the Carlsson and Thall application, and on April 19, 1921, the patent hereinbefore discussed was issued to the Atlas Powder Company.

On July 20, 1919, Mr. Bacon reported the making of low-viscosity nitrocellulose lacquers according to his heat and pressure processes, with varnishes, and that it was found that when these lacquers were used on wood, they showed a tendency to check or crack; but this difficulty was overcome by the addition of castor oil. Mr. Flaherty, more than three years after, made the same suggestion in his patent No. 1,629,999. The report further points out the merits of the lacquers so made by Mr. Bacon.

■ It thus appears that at that time the idea had been conceived, the nitrocellulose solution of reduced viscosity had been prepared, it had been used as a lacquer, and it had been found that it was desirable to add a softening agent—castor oil. This it appears to me was a complete anticipation of the patent in suit. It matters not whether the reduction to use was a commercial use. De Forest Radio Co. v. General Electric Co., 283 U. S. 664, 682, 51 S. Ct. 563, 75 L. Ed. 1339; Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 384, 48 S. Ct. 380, 72 L. Ed. 610. But the Atlas Company did apply for a patent for the discovery. When on an interference priority had been accorded to Carlsson and Thall, the Atlas Company acquired that patent. Thereafter the Atlas Company proceeded under the process covered by its patent to successfully manufacture and exploit commercially nitrocellulose lacquers containing the low-viscosity nitrocellulose developed by Mr. Bacon, and it does not seem to me that the value of this use as an anticipation is in any way affected by the relative commercial success of the product thereof and that of the plaintiff. It in no way detracts from the value of the Bacon-Carlsson and Thall process as an anticipation, that subsequently the Atlas Company superseded that process in its manufacturing processes by the improved process in which the pressure and heat were applied to nitrocellulose suspended in water.

*As to the Hercules Powder Company.*—
The development of low viscosity lacquers is not pleaded as an anticipation, nor does the evidence justify a finding that it, before Flaherty, developed nitrocellulose with viscosities low enough to come within the range of the Flaherty patent.

The evidence does show that during the War, the Hercules Company carried on, alongside of its regular manufacture of explosives, an experimental or semi-experimental plant for the development and manufacture of those types of nitrocellulose which could be sold to the peace-time industries. Subsequent to the War the Hercules Company undertook an investigation of the market for soluble cotton throughout the country.

The report being satisfactory, the company started to supply nitrocellulose or soluble cotton to the lacquer and leather cloth industries.

The pressure of the customers was continually for lower and lower viscosity nitrocellulose with which demands the company attempted to comply, by methods known at the time, and subsequently developed commercially an improved method, which consisted in applying heat and pressure to the nitrocellulose in water.

The process was suggested to the Hercules Company by Mr. Bent, who mentioned the British patent No. 11,941, A. D. 1911, to Chandelon (Exhibit F), the process of which, while not precisely the process suggested by Mr. Bent, was substantially the same.

The process of Mr. Bent, after testing by the Hercules Company, having been found to be satisfactory, was put into practice in digestors procured for the purpose. The product was washed with water and then dried and packed for shipment. Its commercial success was great, and this is the product from which defendant's lacquer is made. The same process was used by the plaintiff after it discontinued the use of the Pitman process disclosed in Flaherty's patent, and by the Atlas Company after it discontinued the use of the Bacon-Carlsson and Thall process.

This process was anticipated in the German patent No. 133,954, to Schulz (Exhibit F).

As to the Perry-Austen prior use, the situation is different, as this was pleaded as an anticipation.

It is not contended that the nitrocellulose of Perry-Austen was produced by the Pitman process, but that it anticipates because nitrocellulose was produced which was well within the range described in the Flaherty patent.

This prior use is the result of the work of Mr. William F. Doerflinger, who in 1911 was practicing as an independent consulting chemist, and to whom a client presented his problem of coating chiffon with nitrocellulose solution.

Mr. Doerflinger determined that his client needed a thinner viscosity nitrocellulose than was available, and devised a process of reducing nitrocellulose solutions for his client.

The process consisted in treating a solution of nitrocellulose in wood alcohol, to which was added a small amount of ammonia, and the action of the ammonia was allowed to continue until the solution had thinned to the desired degree, which was very thin, since the solution had to penetrate the chiffon fabric.

This material, or instructions for making it, he continued to supply to his client until he went into the employ of Perry-Austen Company in 1913, at which time he wrote to his client to make a record of full information about the process, so that his client might continue it on his own account. Shortly after he entered the employ of Perry-Austen Company in 1913, it became evident to him that he could improve certain of their nitrocellulose lacquers by increasing the percentage of nitrocellulose and the percentage of solids, and he developed a means of doing that along the same general lines of the scheme he had worked out originally for his client.

He devoloped a low-viscosity nitrocellulose solution known as No. 415, the method of making which is fully described in his testimony and confirmed by his notebook. The 415 solution became one of the company's stock base solutions, and was extensively used commercially in compounding lacquers by the addition of other solvents, resins, oils, softening agents, etc.; sometimes alone but in most cases in conjunction with nitrocellulose of higher viscosity, between 1913 and 1919. During the War the Perry-Austen Company was the largest American manufacturer of aeroplane dope, and devoted most of its energies to that. The lacquer business was not entirely discontinued. After the War the manufacture of 415 solutions was discontinued by the company, and it bought low-viscosity nitrocellulose on the open market. The viscosity in the 415 solution was approximately ½ second.

On behalf of plaintiff it is argued at length that the measurements of Mr. Doerflinger do not prove that he reduced the viscosity of the nitrocellulose to within the range of the Flaherty patent, but I see no reason for a lengthy discussion on this subject.

Of course, the measurements of Mr. Doerflinger were relative measurements such as are ordinarily made by practical manufacturing men. He was not contemplating a lawsuit or giving evidence in court, and did not make absolute measurements expressed in centipoises.

The evidence of the defendant's witnesses Gilbert, Stern, Battle, and Zucker, and of the plaintiff's witnesses Clark and Schlatter, who made solutions from formulæ in evidence, shows that they got viscosities between ¼ and ½ second Hercules.

The attack on the Perry-Austen lacquers on the ground that ammonia-treated nitrocellulose is unfit for lacquer use is not convincing, because I am convinced that it is fit for use if the acetic acid added is only sufficient to produce neutrality.

Undoubtedly the ammonia treatment, as also the Pitman sodium acetate treatment, are relatively inferior to the subsequently developed pressure process for producing dry, clean, low-viscosity nitrocellulose, as any chemical process leaves in the nitrocellulose solution a certain amount of chemical reaction; but in any event, a satisfactory lacquer can be made both from Doerflinger's and Pitman's reduced viscosity cellulose.

Depending upon the result desired from the lacquer, the viscosity characteristic of the lacquer base was usually varied by blending with the 415 solution a higher viscosity nitrocellulose, which was bought from the Anderson Company, and that the viscosity characteristic of the blend was well below 4 seconds.

The use to which the lacquer is to be put determines the quantity of nitrocellulose in and the viscosity of the nitrocellulose of the lacquer, and not any sudden change in the quality of the lacquer, due to any particular degree of reduction of the base. There is no critical value to which the viscosity of the nitrocellulose base must be reduced.

Mr. Flaherty in his patent recognized this, and he advised blending, as did Mr. Doerflinger, of a reduced viscosity nitrocellulose with a higher viscosity nitrocellulose.

This use seems to me to be a complete anticipation.

Defendant contends that the plaintiff has abandoned its right to enforce the patent, and that the conduct of the plaintiff as the owner of the patent has been such that an equity court will not help it to enforce its rights, and cites Wyeth v. Stone et al., Fed. Cas. No. 18107; Ransom v. New York, Fed. Cas. No. 11573; Bell v. Daniels, Fed. Cas. No. 1247; Williams v. Boston, etc., Co., Fed. Cas. No. 17716; Squier v. American Telephone & Telegraph Co. (D. C.) 21 F.(2d) 747, affirmed (C. C. A.) 7 F.(2d) 831.

Abandonment will not be presumed. It must be proved. It may be proved by express declaration or it may ·be deduced from circumstances.

In the absence of express declaration of the intention to abandon, and even though the conduct is not such as to satisfactorily establish such complete abandonment as would be a defense at law, yet it may furnish a clear and satisfactory ground why a court of equity should not interfere to grant an injunction, or to protect the patentee, or to give any further relief. Wyeth v. Stone, supra.

The Flaherty patent was pending in the Patent Office until May 24, 1927, during which time plaintiff had no patent to protect.

Prior to the issuance of said patent, the business of manufacturing low-viscosity lacquers had become a large one, and of those called as witnesses, most of them had gone into the business before plaintiff's patent issued.

While it may well be true that there is an estoppel as to those who purchased the low-viscosity cellulose from the plaintiff under the assurance of a constant supply (which I do not find, as it is not in issue in this case), that does not apply to the defendant, as it did not purchase the low-viscosity nitrocellulose which it used, from the plaintiff, and there is no estoppel as against defendant.

The same may be said of the permission given by the plaintiff to its customers to purchase from the Hercules Company in June, 1928, when the accident occurred in the plaintiff's plant at Arlington.

Lack of knowledge of plaintiff's patent in suit did not cause this defendant to enter into the manufacture of low-viscosity nitrocellulose lacquers; on the contrary, this defendant had been engaged in that business for a long time before the original of the patent of which the patent in suit was a reissue had been granted.

The reissue was not granted until November 29, 1927, and the plaintiff did not commence to assert its rights until 1930; but that is not such a length of time as of itself to show any intention of abandonment, and there is no evidence to show any change in the position of the defendant after the issuance of the patent, due to failure to notify it of infringement, or to bring an action therefor, which would make it inequitable to grant the plaintiff relief if its patent in suit was valid.

To sustain a finding of abandonment of the patent, the case must be very strong.

Squier v. American Telephone & Telegraph Co., supra.

This case is not strong enough.

This defense has not been sustained.

The alleged great commercial success of the product claimed by plaintiff has not been proved to my entire satisfaction. While it is true that the product is useful as lacquer for some purposes, it seems to me that it is hard to disassociate the Hitt patent, No. 1,-710,453, from the patent in suit in determining commercial success, as they both play a part in the success of lacquer for other purposes; and it is not to be lost sight of that this suit as originally filed was based on both the Flaherty reissue patent, No. 16,803, and the Hitt patent, No. 1,710,453, and that the allegations of the bill with respect to the commercial value are based on the conjoint use of these two patents. In any event, commercial value in itself is not proof of invention, but may be considered when there is doubt on the question of invention. I am laboring under no doubt in the instant suit.

The reissue patent in suit discloses no inventive concept, and the subject-matter claimed was known and used prior to the earliest date which Flaherty could claim.

The patent in suit is invalid.

A decree may be entered in accordance with this opinion in favor of the defendant against the plaintiff, dismissing the bill of complaint herein, with costs. Settle decree on notice. Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court, as provided by the rules of this court.